1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11 | CALIFORNIA SMOKE SHOPS                    No.  1:25-cv-00590-KES-HBK
   | ASSOCIATION, a California nonprofit
12 | mutual benefit corporation,

13 |              Plaintiff,                    ORDER DENYING PLAINTIFF
   |                                           CALIFORNIA SMOKE SHOPS
14 |      v.                                   ASSOCIATION'S MOTION FOR A
   |                                           PRELIMINARY INJUNCTION
15 | CITY OF FRESNO, a California public
   | entity; MIGUEL ARIAS, in his official
16 | capacity; NELSON ESPARZA, in his
   | official capacity; ANNALISA PEREA, in     Doc. 24
17 | her official capacity; and BRANDON
   | VANG, in his official capacity,
18 |
   |              Defendants.
19

20

21         Plaintiff California Smoke Shops Association ("CSSA") brings this action against

22 defendants City of Fresno and Miguel Arias, Nelson Esparza, Annalisa Perea, and Brandon Vang,

23 in their official capacities as members of the Fresno City Council (collectively, "the City"),

24 alleging that a City ordinance regulating smoke shops violates various federal and state

25 constitutional provisions and seeking declaratory and injunctive relief.  Doc. 22.  CSSA moves

26 for a preliminary injunction enjoining enforcement of the ordinance on the grounds that it facially

27 violates the Equal Protection Clause and that a specific provision of the ordinance is

28 unconstitutionally vague.  Doc. 24.  For the reasons set forth below, CSSA's motion for a

                                           1

1  preliminary injunction is denied.

2  **I.      BACKGROUND**

3      **A.      <u>Plaintiff</u>**

4      CSSA is a Fresno-based non-profit mutual benefit corporation organized with the purpose

5  of providing education, resources, and advocacy to its members.  Doc. 24-1 at 5; Doc. 8-1 ¶¶ 2, 4.

6  CSSA has approximately twenty-eight licensed Fresno smoke shop owners as members.  Doc. 24-

7  1 at 5; Doc. 8-1 ¶ 4.

8      **B.      <u>Prior to Enactment of the Ordinance</u>**

9      In October 2023, the City created the Cannabis Administrative Prosecutor Program

10  ("CAPP"), which among other duties, was tasked with conducting inspections of smoke shops in

11  Fresno with the assistance of the Fresno Police Department and the California Department of Tax

12  and Fee Administration.  Doc. 17-1 ¶¶ 3, 6.  When the program began, CAPP inspectors canvased

13  Fresno to document all smoke shop locations at that time and noted 140 smoke shops.  Doc. 18,

14  Ex. B, at 28.

15      On October 31, 2024, CAPP provided an annual report to the City Council.  *Id.* at 27.

16  CAPP reported that at that time it had conducted inspections of 67 smoke shops.  *Id.* at 27–28.

17  The inspectors noted illegal cannabis at 53 of the inspected smoke shops and illegal tobacco at 63

18  of the smoke shops.  *Id.* at 28.  Each inspection revealed at least one code violation related to

19  zoning, building, or electrical standards.  *Id.* at 28, 34.  They also noted that illegal gambling was

20  present at several locations.  *Id.* at 28.  They noted large amounts of cash stashed within many of

21  the shops.  *Id.*  Numerous individuals related to the smoke shops were arrested on felony warrants

22  or charges.  *Id.*  They also noted that a number of smoke shops were illegally selling products to

23  minors.  *Id.* at 68 & Ex. C at 119.[1]  At the end of its presentation to the City, CAPP indicated that

24  to further address the identified issues it needed more inspectors, additional training for its

25  inspectors, and the passage of an ordinance addressing smoke shops (the resulting ordinance is

26  _____

27  [1] The CAPP team also reported that smoke shops had been rebranding into markets or clothing
   stores in an attempt to avoid being subject to regulations governing smoke shops, and that
28  verified gang members were associated with several of the businesses.  *Id.* at 96.

1    the subject of this motion for preliminary injunction).  *Id.* at 99.

2        **C.    The Ordinance**

3        On February 27, 2025, the City Council generally discussed the challenges of regulating

4    smoke shops, support for closing smoke shops across the city to ensure safety and reduce crime,

5    and the effectiveness of a neighboring city's "automatic ban on smoke shops" in maintaining

6    neighborhood safety.  Doc. 8-2, Ex. 4 at 134 & Ex. 5 at 147, 159.   At its March 13, 2025

7    meeting, the City Council discussed the proposed ordinance and the regulation of smoke shops,

8    the impacts of smoke shops on neighborhoods, public nuisances and property owner

9    responsibilities, balancing regulation of smoke shops with fairness to businesses, economic and

10   business considerations, issues with enforcement and compliance, and the potential

11   grandfathering of existing businesses.  Ex. 6 at 168, 185.

12       On April 24, 2025, following further discussion of the proposal, the City Council adopted

13   Ordinance Number 2025-011 ("Ordinance"), which amended sections 15-2761 and 15-6802 of

14   the Fresno Municipal Code.[2]  Fresno, Cal., Code §§ 15-2761, 15-6802; *see also* Doc. 8-2, Ex. 1 at

15   6–89.  Prior to the enactment of the Ordinance, "[t]he former [section] 15-2761 title [of the Code]

16   "pertained to tobacco and vapor sales"; the ordinance amended it to be entitled "Smoke Shops—

17   Permit and Operational Requirements."  *See* Fresno, Cal., Code §§ 15-2761.  Section 15-6802

18   provides definitions for various sections of the Code.  *Id.* § 15-6802.  The Ordinance was deemed

19   approved by mayoral inaction on May 5, 2025, *see* Doc. 8-2, Ex. 1 at 88–89, and became

20   effective on June 5, 2025, Fresno, Cal., Code §§ 15-2761, 15-6802.

21       The Ordinance states that it is intended "[t]o establish regulations for Smoke Shops" and

22   "[t]o amortize existing Smoke Shops and allow up to seven Smoke Shops per City Council

23

24   _____

     [2] For purposes of its procedural due process claims, CSSA argues that the City Council's
25   adoption of the Ordinance on April 24, 2025 was unconstitutional given its contention that the
     City Council held a final vote on the Ordinance at the March 13, 2025 meeting in which it did not
26   pass, triggering a need to start the legislative process over with public notice and hearing.  *See*
     Doc. 22 ¶¶ 85–95.  Because CSSA's motion for preliminary injunction is not based on its
27   procedural due process claims, this Order does not address the factual allegations related to those
     contentions.

28

District." *Id.* § 15-2761(A).  A "Smoke Shop" is defined as "[a]ny business that primarily sells or offers for sale any Smoke and Vapor Products,[3] but shall not include: Tobacco Retailers; establishments that sell Smoke and Vapor Products for onsite consumption (such as cigar lounges); or establishments operating under Article 33 of Chapter 9 (Cannabis Retail Business and Commercial Cannabis Business)." *Id.* § 15-6802.  A "Tobacco Retailer" is defined as "[a]ny establishment whose business includes the incidental sale of Smoke and Vapor Products, such as supermarkets and convenience stores." *Id.*

The Ordinance provides that "Existing Smoke Shops," which it defines as lawfully established smoke shops with a business license, "may continue operation for 18 months from the effective date of this Ordinance, provided they comply with Subsection C.1." *Id.* §§ 15-2761(C)(3); 15-6802.  Subsection C.1 provides that Existing Smoke Shops "must come into compliance with all operational requirements [listed in the Ordinance] within 30 days" of the Ordinance's effective date and that "[n]o Existing Smoke Shop may make a substantial change of mode or character of their operation." *Id.* § 15-2761(C)(1).  Any Existing Smoke Shop "that can demonstrate that 18 months is an insufficient amount of time to amortize their investment" may "submit a request for reconsideration," including information such as the amount of the investment and the expiration date and termination rights of the smoke shop's lease, to be considered for a longer term for amortization.  *Id.* § 15-2761(C)(3)(a).

The Ordinance also provides for a new permitting regimen for smoke shops.  *Id.* § 15-2761(D).  The Ordinance limits the number of smoke shops that can operate in each of Fresno's seven City Council districts to seven smoke shops per district.  *Id.*  To operate in one of the districts, smoke shops are required to obtain a "Conditional Use Permit," which any Existing Smoke Shop or any new smoke shop may apply for following the Ordinance's effective date.  *Id.* If more than seven applications are received in a district, the Ordinance requires the City to "hold a lottery within 120 days of the close of the application period" to determine which applications will be reviewed for a Conditional Use Permit.  *Id.* § 15-2761(D)(2).

---

[3] "Smoke and Vapor Products . . . [i]nclude, but may not be limited to, Tobacco Products and Smoking Paraphernalia."  Fresno, Cal., Code § 15-6802.

The operational requirements imposed by the Ordinance include:

(1) "Landscaping" – Smoke Shops must comply with landscaping requirements provided per the underlying zone district's development standards, based on whether their business is within a new or existing building;

(2) "Lighting" – the exterior of the premises must be illuminated in accordance with the lighting requirements of the underlying zone district;

(3) "Litter and Graffiti" – trash and recycling receptacles must be provided near each Smoke Shop's public entrances and exits; the business operator must provide for daily removal of trash, litter, and debris from the premises, sidewalk, and parking areas; and the business operator must remove graffiti;

(4) "Vending Machines" – internal and external vending machines are prohibited;

(5) "Video Surveillance" – Smoke Shops must equip a minimum of 3 digital cameras that meet various requirements, including, among other things, recording in color, having a certain memory capacity, and being placed in certain areas of the store;

(6) "Signage" – Smoke Shops must display certain signs regarding age requirements related to tobacco consumption, loitering, and smoking on the premises;

(7) "Glazing" – at least 50% of any street facing façade must be glazed with clear, non-tinted material, and no more than 5% of each window visible to the public can bear advertising;

(8) "Loitering and Other Nuisance Activities"[4] – "[t]he operation of a Smoke Shop

---

[4] Nuisance activities "may include, but are not limited to, disturbances of the peace, illegal drug activity, public intoxication, drinking in public, Smoke and Vapor Product sales to minors, harassment of passersby, gambling, prostitution, sale of stolen goods, public urination, theft, assaults, batteries, acts of vandalism, loitering, excessive littering, graffiti, illegal parking, excessive loud noises (especially in the late night or early morning hours), traffic violations, curfew violations, lewd conduct, or other violations of City, State, or federal laws, especially when contributing to a proportionally high rate of police reports and arrests to the area." *Id.* § 15-2761(G)(8).

5

shall not result in repeated nuisance activities on the property," and the business operator must post appropriate Code signs advising that "consumption of alcoholic beverages, gambling, trespassing, or loitering on private property is a violation of municipal ordinances," and must send a letter to the Fresno Police Department every 12 months that authorizes the Department's peace offices to enter and remove trespassers during nonbusiness hours;

(9) "Training" – the business operator and its employees must complete approved courses regarding the sale and handling of Smoke and Vapor Products at certain intervals;

(10) "Compliance with Laws" – Smoke Shops must remain in compliance with all local, State, and federal laws, regulations, and orders;

(11) "Posting of Conditions" – Smoke Shops must post a conspicuous copy of all conditions of approval and training requirements in certain approved locations on the premises and provide a copy of such on request to patrons and law enforcement;

(12) "Prohibited Products" – Smoke Shops are prohibited from selling or distributing cannabis or cannabinoid products, drug paraphernalia, nitrous oxide, flavored tobacco, other products prohibited by law, or onsite or online gambling activities not related to the California Lottery, and a maximum of 25% of the floor area of the premises may display smoking paraphernalia for sale or viewing;

(13) "Hours of Operation" – Smoke Shops may operate only between 8:00 a.m. and 10 p.m.;

(14) "Non-Operating Rule" – when rights granted by a Conditional Use Permit are discontinued for more than a year, a new permit is required; and

(15) "Additional Requirements" – Smoke Shop operators must submit a security plan; Smoke Shops may be required to submit additional relevant information with an application for a Conditional Use Permit; applications for Conditional Use Permits may be referred to other City departments to ensure compliance with other

applicable laws and such City departments may conduct an inspection of the

premises to determine compliance; additional measures may be required if harm,

nuisance, or related problems occur as a result of business practices or operations,

to be determined on a case-by-case basis by the Police Department; and Smoke

Shops shall be subject to at least annual inspections to ensure compliance with the

Ordinance and any other conditions of the Conditional Use Permit, the cost of

which the Smoke Shop operator must reimburse the City.

*Id.* § 15-2761(G)(1)–(15).  As noted, Existing Smoke Shops, regardless of their intent to apply for

a Conditional Use Permit, were required to comply with the Ordinance within 30 days of its

effective date—that is, by July 5, 2025.  *Id.* § 15-2761(C)(1).

The Ordinance also provides location restrictions for "all Smoke Shops, except Existing

Smoke Shops not seeking a Conditional Use Permit to continue operations after expiration of the

Amortization Period," which include not being located within 1,000 feet of another Smoke Shop

or within 1,000 feet of locations labeled "[s]ensitive [u]ses" such as parks, playgrounds, certain

recreational areas, youth facilities, nursery schools, preschools, day care facilities, public schools,

and alcohol or drug abuse recovery or treatment facilities.  *Id.* § 15-2761(F).

The Ordinance provides that violation of its standards may result in the amendment or

revocation of a Conditional Use Permit.  *Id.* § 15-2761(H)(1).  It further provides that "[f]ines

may be imposed [for violations of the Ordinance] in accordance with Sections 1-305 and 1-308 of

this Code."[5]  *Id.* § 15-2761(H)(2).  Section 1-305 of the Fresno Municipal Code is entitled

"Criminal Citations" and provides that when the Fresno Municipal Code or any other ordinance

of the city empowers an officer or employee of the city to enforce a particular provision of the

Code or ordinance and where "the violation of that provision would constitute a misdemeanor or

infraction," the officer or employee "shall have the authority to arrest without warrant and to

---

[5] The Ordinance provides that fines imposed pursuant to section 1-305 shall be imposed in accordance with the Master Fee Schedule, except that it provides specific fees to be imposed for the specific misdemeanor offenses of sales to minors and external advertising.  *Id.*

1  issue criminal citations."[6]  *Id.* § 1-305(b); *see also* Doc. 24-2, Ex. 19.  Section 1-308 of the Fresno

2  Municipal Code is entitled "Administrative Citations and Penalties" and provides that "[a]ny

3  person violating any provision of the Code may be issued an administrative citation by an

4  enforcement officer."  Fresno, Cal., Code § 1-308(a); *see also* Doc. 24-2, Ex. 19.

5         **D.    Procedural History**

6         On May 19, 2025, CSSA initiated this case, challenging the constitutionality of the

7  Ordinance under various provisions of the federal and California constitutions.  Doc. 2; *see also*

8  Doc. 22 (CSSA's first amended complaint).  On May 28, 2025, CSSA filed a motion for a

9  temporary restraining order to enjoin the enactment and enforcement of the Ordinance.  Doc. 8.

10  On June 3, 2025, the Court held a hearing on the motion for a temporary restraining order, denied

11  the motion, and, with the input of the parties, set a briefing schedule for the present motion for

12  preliminary injunction.  Doc. 19.   CSSA filed its first amended complaint on June 16, 2025.

13  Doc. 22.

14         On June 17, 2025, CSSA filed its motion for a preliminary injunction to enjoin

15  enforcement of the Ordinance on equal protection and vagueness grounds.  Doc. 24.  Following

16  the parties' joint stipulation further extending the briefing deadlines, the City filed its opposition

17  on August 12, 2025, Doc. 28, and CSSA filed its reply on August 22, 2025, Doc. 30.  The City

18  filed objections to the reply on August 27, 2025.  Doc. 31.  The Court held argument on the

19  motion on September 8, 2025.

20  ///

21  ///

22

23  [6] Section 1-304 of the Fresno Municipal Code clarifies that "[a]ny person violating any of the

24  provisions or failing to comply with any of the requirements of this Code shall be guilty of a
    misdemeanor unless: (1) [s]uch Code provision makes violation thereof an infraction; or (2) [t]he
    City Attorney files a complaint charging the offense as an infraction; or (3) the court, with the

25  consent of the defendant, determines that the offense is an infraction, in which event the case

26  shall proceed as if the defendant had been arraigned on an infraction complaint; or (4) [t]he city,
    at its discretion, may issue an administrative citation and civil penalty in lieu of charging any

27  violation of the Code as a misdemeanor or an infraction."  § 1-304(b).  As the Ordinance does not
    make the sale of flavored tobacco an infraction, such conduct is a misdemeanor unless subject to

28  one of the other listed exceptions.  *See id.* § 15-2761(G)(12).

1    **II.    ANALYSIS**

2    Though CSSA's first amended complaint challenges the Ordinance on a variety of federal

3    and state constitutional grounds, including procedural due process, substantive due process, and

4    regulatory takings, Doc. 22, for purposes of CSSA's motion for preliminary injunction, CSSA

5    argues only that enforcement of the Ordinance should be enjoined because the Ordinance facially

6    violates the equal protection clause and, as to its provision concerning "flavored tobacco," is

7    facially unconstitutionally vague. *See generally* Doc. 24-1.

8    **A.  Standing & Ripeness**

9    As threshold matters, the City argues that CSSA lacks standing to bring this motion for

10    preliminary injunction and that this matter is not ripe for review.[7]

11    **1.  Standing**

12    The Court has an independent obligation to ensure that standing is established, as

13    "perhaps the most important" jurisdictional doctrine. *See FW/PBS, Inc. v. City of Dallas*, 493

14    U.S. 215, 231 (1990) (citation omitted).  To have Article III standing, a person or entity must

15    have (1) a concrete and particularized injury in fact; (2) a causal connection between the injury

16    and the defendant's alleged conduct; and (3) a likelihood that a favorable decision of this Court

17    would redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  "An

18    association has standing to bring suit on behalf of its members when its members would

19    otherwise have standing to sue in their own right, the interests at stake are germane to the

20    organization's purpose, and neither the claim asserted nor the relief requested requires the

21    participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't*

22    *Servs., Inc.*, 528 U.S. 167, 181 (2000).

23    "[S]tanding is not dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734

24    (2008) (citation omitted).  "[A] plaintiff must demonstrate standing for each claim he seeks to

25    press and for each form of relief that is sought." *Id.* (cleaned up).  Additionally, "each element

26

27    [7] The City has not moved to dismiss this case for lack of standing or ripeness. *See* Docket.
      However, the City asserts lack of standing and ripeness as affirmative defenses in its answer to

28    the FAC.  Doc. 27.

1   must be supported in the same way as any other matter on which the plaintiff bears the burden of

2   proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the

3   litigation." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan v.*

4   *Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  "At the preliminary injunction stage, the

5   plaintiffs 'must make a clear showing of each element of standing.'"  *L.A. All. for Hum. Rts. v.*

6   *County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021) (quoting *Yazzie v. Hobbs*, 977 F.3d 964,

7   966 (9th Cir. 2020)).

8          CSSA's membership consists of 28 owners of licensed smoke shops.  For CSSA to have

9   standing to bring this motion for preliminary injunction, CSSA must first show that its members

10  would have standing to bring this motion in their own right.  CSSA must demonstrate standing

11  for each claim it "seeks to press," which for purposes of its motion for preliminary injunction are

12  its equal protection and unconstitutional vagueness claims.[8]  Here, the City contests only the first

13  element of standing as to CSSA's members—that is, whether CSSA has adequately shown that its

14  members have suffered a concrete and particularized injury in fact.  Doc. 28 at 4–6.

15         The City argues that CSSA cannot have associational standing because CSSA likely has

16  uninjured members that will receive a Conditional Use Permit and that will not be cited for any

17  violations of the Ordinance.  Doc. 28 at 6.  However, all members need not suffer an injury for

18  CSSA to have associational standing.  Rather, CSSA must establish only that at least one of its

19  members has suffered or will suffer harm.  *Associated Gen. Contractors of Am., San Diego*

20  *Chapter, Inc. v. California Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).  The City also

21  argues that none of CSSA's members "have . . . suffered, actual or imminent injury" because

22  CSSA is "concerned about . . . alleged code enforcement activities by the City that [CSSA]

23  alleges could occur, but have not occurred, and may never occur against some smoke shops

24  because those smoke shops will come into compliance with the Ordinance."  Doc. 28 at 5.

25  However, it is well established that a party's choice to comply with an allegedly unconstitutional

26  _____

27  [8] The Court need not address at this time whether CSSA has associational standing to bring the
    other claims in the FAC, as such claims are not before the Court for purposes of this motion for
    preliminary injunction.  *See Davis*, 554 U.S. at 734 ("[S]tanding is not dispensed in gross.").

28

1    provision to avoid being sanctioned does not negate a party's injury for being subject to such

2    unconstitutional provision in the first place.  *See Fed. Election Comm'n v. Cruz*, 596 U.S. 289,

3    298 (2022).

4         CSSA alleges that (i) the Ordinance violates the equal protection clause because it

5    regulates smoke shops, by requiring them to take certain actions and prohibiting them from

6    engaging in others, but does not regulate other businesses that sell tobacco and smoking

7    paraphernalia, and (ii) the Ordinance's prohibition on the sale of flavored tobacco, violation of

8    which potentially carries criminal liability, is unconstitutionally vague.  "Impairments to

9    constitutional rights are generally deemed adequate to support a finding of 'injury' for purposes

10   of standing."  *Council of Ins. Agents & Brokers v. Molasky–Arman*, 522 F.3d 925, 931 (9th Cir.

11   2008).  Whether CSSA is likely to succeed on the merits of these two claims does not affect

12   whether CSSA's members would have standing to bring them.  *See, e.g.*, *Borja v. Nago*, 115

13   F.4th 971, 977 (9th Cir. 2024) ("The possibility that [a plaintiff's] claim of unconstitutional

14   discrimination may ultimately fail on the merits has no bearing on whether they have Article III

15   standing to receive that adjudication on the merits in the first place.").  Rather, "[f]or standing

16   purposes, [the Court] accept[s] as valid the merits of [a plaintiff's] legal claims . . .."  *Fed.*

17   *Election Comm'n*, 596 U.S. at 298.  Additionally, the harms CSSA alleges its members face due

18   to the Ordinance would be redressed by a favorable decision in this case.  Thus, CSSA's members

19   would have standing to bring the two facial challenges CSSA asserts in its motion for preliminary

20   injunction.

21        The other two requirements for associational standing are also met.  The interests at

22   stake—that is, CSSA's members' constitutional rights regarding equal protection and fair notice

23   of the conduct prohibited by the Ordinance—are germane to the organization's purpose, as

24   CSSA's organizational purpose is to provide education, resources, and advocacy to its members.

25   Nor does the City argue otherwise.  *See generally* Doc. 28 at 4–6.

26        CSSA's facial equal protection claim and its vagueness claim also do not require the

27   participation of its individual members.  The City argues that this case requires the participation

28   of CSSA's members because individual smoke shops will have the ability to file appeals with the

1    City or to pursue state court remedies if they are cited for a violation of the operating

2    requirements, or if they do not receive a conditional use permit, and any such appeals or state

3    court remedies will require the participation of those individual smoke shops.  However, the City

4    fails to explain why the presence of a city or state remedy for such individual grievances

5    forecloses this motion for preliminary injunction or requires the individual members to be present

6    for CSSA to facially challenge the Ordinance's constitutionality under the equal protection clause

7    or its alleged vagueness as to the definition of flavored tobacco.[9]

8         CSSA's equal protection and vagueness challenges are facial, and CSSA and the City can

9    adequately litigate whether the Ordinance violates the equal protection clause, or is

10   unconstitutionally vague, without the need for individualized proof from CSSA's members.

11   Additionally, CSSA seeks declaratory and injunctive relief, which also does not require

12   individualized proof.  The participation of individual members is not required "when claims

13   proffered and relief requested do not demand individualized proof on the part of [the

14   organization's] members."  *See, e.g.*, *Associated General Contractors of California, Inc. v.*

15   *Coalition for Economic Equity*, 950 F.2d 1401, 1408 (9th Cir. 1997).

16        Thus, CSSA has associational standing to bring this motion for preliminary injunction on

17   behalf of its members.

18        **2.  Ripeness**

19        The City argues that this matter is not ripe for review because a plaintiff may not bring as-

20   applied takings and substantive due process claims until that plaintiff receives a final decision

21   regarding the property at issue.  Doc. 28 at 10-11 (citing *Ballard*, 2025 WL 618110, at *1).  The

22   City also generally argues that CSSA's procedural due process claim should fail.  *Id.*  However,

23   CSSA's motion for preliminary injunction is not premised on those claims.  The motion is based

24   _____

25   [9] The City's argument seems more directed at an as applied challenge.  "As-applied takings and
     substantive due process claims are not ripe until a plaintiff receives a final decision regarding the
26   application of the regulations to the property at issue."  *See, e.g.*, *Ballard v. City of West*
     *Hollywood*, No. 24-538, 2025 WL 618110 (9th Cir. Feb. 26, 2025) (citations omitted).  However,
27   as noted, CSSA's motion for preliminary injunction is not based on CSSA's takings or
     substantive due process claims and does not proceed on any as applied challenges to the
28   Ordinance.

1    on CSSA's facial claims for alleged violation of the equal protection clause and its members'

2    constitutional right to adequate notice of conduct prohibited by the Ordinance—namely, the

3    Ordinance's prohibition on the sale of flavored tobacco.

4        Ripeness concerns the timing of the case, as courts may only address live cases or

5    controversies. *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).

6    The Ordinance is currently in effect and applies to CSSA's members. For purposes of this

7    motion, CSSA makes legal challenges to the Ordinance—that is, whether the Ordinance facially

8    violates the equal protection clause and whether its prohibition on the sale of "flavored tobacco"

9    is impermissibly vague. As noted above, determining whether the Ordinance violates equal

10   protection or is unconstitutionally vague does not require additional factual development of the

11   record. *See, e.g.*, *Stavrianoudakis v. United States Fish & Wildlife Serv.*, 108 F.4th 1128, 1139

12   (9th Cir. 2024) ("A claim is fit for decision if the issues raised are primarily legal, do not require

13   further factual development, and the challenged action is final.").

14       Thus, CSSA's motion for preliminary injunction, related to its second and third causes of

15   action in the FAC, is ripe for review.[10]

16       **B.  Motion for Preliminary Injunction**

17       "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

18   *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–

19   90 (2008)). "A plaintiff seeking a preliminary injunction must establish that he is likely to

20   succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

21   relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

22   *Id.* at 20 (citing *Munaf*, 553 U.S. at 689–90; *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S.

23   531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982)). "Likelihood of

24   success on the merits is a threshold inquiry and is the most important factor." *Simon v. City &*

25   *Cnty. of San Francisco*, 135 F.4th 784, 797 (9th Cir. 2025) (quoting *Env't Prot. Info. Ctr. v.*

26

27   _____

     [10] As with standing, the Court need not address at this time whether the other claims in the FAC
28   are ripe, as such claims are not before the Court for purposes of this motion for preliminary
     injunction.

1  *Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)).  "When, like here, the nonmovant is the government,

2  the last two Winter factors 'merge.'"  *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023)

3  (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th

4  Cir. 2020) (per curiam)).  "As a general matter, district courts 'must consider' all four Winter

5  factors."  *Id.* (quoting *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014)); *see also*

6  *Benisek v. Lamone*, 585 U.S. 155, 158 (2018).

7  　　　Additionally, "a preliminary injunction may issue where 'serious questions going to the

8  merits were raised and the balance of hardships tips sharply in plaintiff's favor' if the plaintiff

9  'also shows that there is a likelihood of irreparable injury and that the injunction is in the public

10  interest.'"  *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122

11  F.4th 825, 844 (9th Cir. 2024) (quoting *Cottrell*, 632 F.3d at 1135).

12  　　　A preliminary injunction may issue "only if the movant gives security in an amount that

13  the court considers proper to pay the costs and damages sustained by any party found to have

14  been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).

15  　　　　　　**1.  Likelihood of Success on the Merits**

16  　　　　　　　　**i.  Equal Protection**

17  　　　CSSA contends that the Ordinance violates its members' right to equal protection under

18  the federal and California constitutions.  *See generally* Doc. 24.  CSSA's claims under both

19  constitutions can be addressed together, because "[t]he equal protection analysis under the

20  California Constitution is 'substantially similar' to analysis under the federal Equal Protection

21  Clause."  *Olson v. California*, 104 F.4th 66, 76 (9th Cir. 2024).  "The Equal Protection Clause of

22  the Fourteenth Amendment commands that no State shall 'deny to any person within its

23  jurisdiction the equal protection of the laws,' which is essentially a direction that all persons

24  similarly situated should be treated alike."  *City of Cleburne, Texas v. Cleburne Living Center*,

25  473 U.S. 432, 439 (1985); *see also* U.S. Const. amend. XIV.

26  　　　CSSA does not contend that the Ordinance employs suspect classifications or that it

27  impinges on fundamental rights; rather, CSSA asserts that the legislation is "economic and social

28  welfare legislation" and acknowledges that rational basis review applies to its equal protection

1   claim.  Doc. 24-1 at 13.  Under this standard, the Ordinance  "carries with it a presumption of

2   rationality," and it must be upheld if "the legislative means are rationally related to a legitimate

3   governmental purpose."  *Olson*, 104 F.4th at 76–77 (citation omitted).

4        To establish an Equal Protection claim, CSSA must first demonstrate that its members are

5   "similarly situated" to another class and "ha[ve] been treated disparately" from that class.  *Id.*

6   (citations omitted).   The comparator groups "need not be similar in all respects, but they must be

7   similar in those respects relevant to the [challenged] policy."  *Id.* (citations omitted).  Once CSSA

8   "identif[ies] a similarly situated class that is treated disparately under [the Ordinance], [it] must

9   also negate 'every conceivable basis which might support' such disparate treatment."  *Id.*

10  (citations omitted).

11       CSSA contends that its members—licensed smoke shops that primarily sell tobacco

12  products and smoking paraphernalia—are similarly situated to several groups of businesses to

13  which the Ordinance does not apply but that also sell tobacco or smoking paraphernalia:

14  (1) businesses that also primarily sell tobacco products (such as cigar lounges) or smoking

15  paraphernalia (such as retail cannabis stores); (2) businesses for which tobacco product sales are

16  incidental to the sale of other goods (such as supermarkets, convenience stores, gas stations,

17  liquor stores, and pharmacies); and (3) businesses for which tobacco product sales fall somewhere

18  between "primary" and "incidental" (such as online delivery services like "GoPuff" that deliver

19  alcohol, tobacco, CBD, snack, and dessert products to Fresno residents).  Doc. 24-1 at 14–15.

20       The City does not address in its briefing whether CSSA's members are similarly situated

21  to these other businesses.[11]  Nonetheless, these retailers arguably are not similarly situated to

22  smoke shops for purposes of this Ordinance:  unlike smoke shops, cigar lounges primarily sell

23  tobacco products for on-site consumption, retail cannabis stores are prohibited from selling

24  tobacco (*see* Fresno, Cal., Code § 9-3309(c)), and the remaining categories of tobacco retailers

25  (e.g., gas stations, supermarkets, and liquor stores) do not primarily sell smoke and vapor

26

27  [11] *See* Doc. 28 at 2 (acknowledging that part of the equal protection analysis is whether the
    comparator groups are similarly situated but arguing only that the Ordinance survives rational
28  basis review).

1    products.  In any event, the Court need not decide the issue, because, even assuming that these

2    other businesses were similarly situated to CSSA's members, and that the Ordinance treats those

3    businesses disparately, CSSA's equal protection claim is not likely to succeed on the merits

4    because it passes muster under rational basis scrutiny.

5          "When conducting rational basis review of economic legislation that disparately treats

6    similarly situated groups," the Court considers whether "there is any reasonably conceivable state

7    of facts that could provide a rational basis for the classification."  *Olson*, 104 F.4th at 77–78

8    (citation omitted).  The Court "need not rely on the legislature to proffer its actual rationale

9    motivating the legislation."  *Id.* at 78 (citation omitted).  Indeed, the legislature need not proffer

10   "any rationale, for that matter."  *Id.* (citation omitted).  The Court should consider any "purposes

11   the legislature [or] litigants . . . have espoused," or "any other rational purposes possibly

12   motivating enactment of the challenged statute."  *Id.* (citation omitted).  "And so long as there is

13   some conceivable legitimate purpose justifying the statute, [the Court] need not inquire into the

14   legislature's actual purpose in enacting it."  *Id.* (citation omitted).  "States are accorded wide

15   latitude in the regulation of their local economies under their police powers, and rational

16   distinctions [between similarly situated groups] may be made with substantially less than

17   mathematical exactitude."  *City of New Orleans v. Dukes*, 4727 U.S. 297, 303 (1976).  "[I]n the

18   local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which

19   cannot stand consistently with the Fourteenth Amendment."  *Id.* at 303–04.

20         The Ordinance's stated purposes are to "[t]o establish regulations for Smoke Shops" and

21   "[t]o amortize existing Smoke Shops and allow up to seven Smoke Shops per City Council

22   District."  Fresno, Cal., Code § 15-2761(A).  The City Council's discussions regarding the

23   proposed Ordinance on March 13, 2025, and April 24, 2025, prior to its enactment, included

24   concerns with smoke shops' illegal sales of tobacco to minors and illegal sales of cannabis, and

25   with public nuisance and neighborhood safety issues relating to smoke shops.  The City argues

26   that it has a legitimate governmental interest in preventing such conduct and nuisances and in

27   regulating tobacco sales for public health reasons.  The City cites to its inspections of smoke

28   shops, which found that a vast majority of the smoke shops inspected were selling illegal

16

1  cannabis and illegal tobacco, that all of the inspected smoke shops were in violation of building

2  codes, that various smoke shops were selling tobacco to minors, and that a number of smoke

3  shops had large sums of cash or illegal gambling operations on the premises. *See generally*

4  Doc. 28; *see also* Doc. 18, Exs. B, C; Docs. 17-1, 17-2. The City also notes that the inspections

5  resulted in the arrest on felony charges of numerous individuals related to the operation of the

6  smoke shops. *See* Doc. 28.

7          The parties agree that preventing nuisances and protecting the public health, including

8  preventing tobacco sales to minors, are legitimate government interests and that the Ordinance is

9  rationally related to those interests. *See* Doc. 24-1 at 15; *see generally* Doc. 28.  Thus, the

10  analysis turns to whether the Ordinance's distinction between smoke shops and other types of

11  tobacco retailers is rationally related to the Ordinance's goals.

12          The City does not put forth any specific argument regarding whether the Ordinance's

13  disparate treatment of smoke shops and other types of tobacco retailers is rationally related to the

14  Ordinance's purposes, *see generally* Doc. 28, but as noted, the Court must consider "any . . .

15  rational purposes possibly motivating enactment of the challenged statute," *Olson*, 104 F.4th

16  at 78.  The Court concludes that there are conceivable rational reasons for such disparate

17  treatment.

18          It is certainly "conceivable" that illegal sales of tobacco and cannabis, violations of the

19  Fresno Municipal Code, and related public nuisances "are more rampant in certain industries and

20  therefore deserving of special attention." *Olson*, 104 F.4th at 78.  Thus, "[t]o the extent that [the

21  City Council] perceived" smoke shops "as posing a greater risk" of illegal sales, code violations,

22  and public nuisances, the City Council "acted rationally by striking at the evil where it is felt and

23  reaching the class of cases where it most frequently occurs." *Id.* (citations and quotations

24  omitted); *see also Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1086 (9th Cir. 2015)

25  (recognizing that "[t]argeting the biggest contributors" to a perceived problem "is certainly

26  rationally related to a legitimate policy goal" and, thus, a legislature may approach a problem

27  incrementally by targeting the worst offenders).  "It is not necessary that such a perception be

28  supported by evidence or empirical data." *Olson*, 104 F.4th at 78 (citation omitted).

1    Indeed, the City Council's discussions prior to enacting the Ordinance reflects the

2    Council's apparent belief that smoke shops commit legal violations at a greater frequency than

3    other tobacco retailers.  *See* Doc. 8-2 ¶ 15 ("Video Footage of Fresno City Council's April 24,

4    2024 Meeting") at 5:58:33–5:59:21 (Vice President of the City Council Miguel A. Arias, and co-

5    sponsor of the Ordinance, stated: "The fact is, after two years of inspections, Costco is not the one

6    selling marijuana to the public.  Walmart is not the one selling tobacco to teenagers.  This

7    [proposed Ordinance] focuses on the area of problem, which is the self-identified smoke shops

8    that currently have zero rules.  And after two years of us working on this policy, after . . .

9    inspection, after re-inspections of their establishments, our code enforcement, police department,

10    attorney general are still finding illegal products in re-inspections, in the same places that we just

11    told them two months ago they couldn't be selling marijuana and they couldn't be selling tobacco

12    to kids."); *see also, e.g.*, *id.* at 6:17:09–6:17:29 (Councilmember Yang represents that he has

13    heard from his constituents "loud and clear" that they support the Ordinance and are concerned

14    about smoke shops) & 6:12:22–6:12:34 (Councilmember Mike Karbassi stating that he would

15    like to bring forward a different proposal to the one at hand, but that would still be "specifically

16    for smoke shops" rather than all tobacco retailers, acknowledging the Council and community is

17    most concerned with smoke shops).[12]

18    CSSA argues that the Ordinance's disparate treatment of smoke shops and other tobacco

19    retailers is arbitrary and irrational, because the City Council enacted the Ordinance based on

20    inspections of smoke shops, without presenting or considering any evidence regarding "how well

21    [the] other tobacco sellers comply with Fresno municipal codes," and, similarly, has not presented

22    any such data regarding the other tobacco retailers to this Court.  Doc. 24-1 at 16.  CSSA cites the

23    April 24, 2025, Fresno City Council Meeting for support for this proposition, in which, when

24    asked by Councilmember Karbassi whether the City's inspections related to illegal sales of

25    tobacco to minors extended to other tobacco retailers or only to Smoke Shops, City Attorney

26

---

27    [12] The video footage of the April 24, 2025 meeting can also be found at the following link:
https://www.youtube.com/watch?v=aEKcBERyuQU&t=22920s.

28

1   Andrew Janz stated, "we haven't looked at those locations." *Id.* (citing video footage of the April

2   24, 2025 City Council Meeting from 06:22:00 to 06:23:00).[13]   However, the City Council's

3   perception that smoke shops pose a greater risk than other tobacco retailers of conducting illegal

4   sales, violating the municipal code, and creating nuisances need not be supported "by evidence or

5   empirical data" to survive rational basis review.  *Olson*, 104 F.4th at 78; *see also American*

6   *Society of Journalists and Authors, Inc. v. Bonta*, 15 F.4th 954, 965 (9th Cir. 2021) ("[A]

7   legislative choice is not subject to courtroom fact-finding and may be based on rational

8   speculation unsupported by evidence or empirical data." (quoting *F.C.C. v. Beach Commc'ns,*

9   *Inc.*, 508 U.S. 307, 315 (1993))).

10        Regardless, it appears the City Council *did* consider evidence related to this matter.

11   Immediately following the City Attorney's statement that the Council had not looked at the other

12   tobacco retailers' violations regarding illegal tobacco sales to minors, Councilmember Arias

13   noted that the City requires annual general inspections for all retail alcohol conditional use permit

14   holders, which would include many of the businesses that CSSA identifies as also selling tobacco

15   productions, such as gas stations and convenience stores, and that those annual inspections had

16   not shown such businesses to be engaging in illegal cannabis or illegal tobacco sales.  Doc. 8-2

17   ¶ 15 at 06:22:50–06:23:23.

18        There are also conceivable rational reasons to treat brick-and-mortar establishments for in-

19   person consumption of tobacco (such as cigar lounges), brick-and-mortar establishments that sell

20   smoking paraphernalia but not tobacco products (such as retail cannabis stores), and online

---

[13] In a similar vein, CSSA argues that the data that the City relied on in determining that smoke shops needed regulating did not show that it inspected licensed smoke shops, as opposed to unlicensed smoke shops.  Doc. 24-1 at 20.  It is not entirely clear how an alleged failure to distinguish between licensed and unlicensed smoke shops supports CSSA's equal protection claim that the Ordinance treats smoke shops differently from *other tobacco retailers*.  Regardless, CSSA's assertion appears to be incorrect.  Council Member Annalisa Perea asked the City Attorney during the April 24, 2025 meeting, "out of all the smoke shops you have raided and found illegal products, have any of those had a business license?" and the City Attorney responded "Yes."  Doc. 8-2 ¶ 15 at 6:18:24–6:18:43.  She then stated, "So, even the ones that have a business license . . . we can't necessarily consider those [ones] 'good actors' either," to which the city attorney responded, "That's correct."  *Id.*  Additionally, CSSA has put evidence in the record that its members, which are licensed smoke shops, were included in the City's inspections.  *See, e.g.*, Doc. 8-1 ¶ 11.

tobacco delivery services (such as GoPuff) differently from brick-and-mortar smoke shops. As for in-person consumption establishments, such as cigar lounges, such disparate treatment is analogous to disparately regulating retail stores that sell alcohol for off-site consumption and restaurants that serve alcohol for on-site consumption, which is a commonplace practice and has been held to survive rational basis review. *See, e.g.*, *G & G Fremont, LLC v. City of Las Vegas*, 202 F. Supp. 3d 1175, 1182 (D. Nev. 2016) ("Since the City has the authority and the interest in regulating alcohol sales, it may treat sellers of alcohol who operate in different ways with differing ordinances and requirements."). There is also a rational basis for treating retail cannabis stores that sell smoking paraphernalia, but not tobacco products, differently from smoke shops: given that such stores may legally sell cannabis and do not sell tobacco, there does not appear to be the same risk of illegal cannabis sales or illegal tobacco sales that the Ordinance intends to combat. As for online tobacco delivery services, such mobile delivery services present distinct issues that do not involve the type of on-site nuisances affecting the community and surrounding businesses that the City could rationally identify to be a concern with smoke shops. It would also be rational for the City to treat smoke shops differently than establishments such as gas stations and grocery stores that sell tobacco products only incidentally, rather than as their primary products.

As for the Ordinance's requirement that smoke shops obtain a conditional use permit to operate past the 18-month amortization period, and its provision that limits the number of conditional use permits to seven per district, there are also conceivable rational bases for the City Council to disparately impose such regulations on smoke shops and not on other tobacco retailers. The City Council's discussion of the Ordinance prior to voting to pass it indicates the Council's great concern about the number of smoke shops in Fresno, the concentration of those smoke shops in relation to one another, and the rate at which they "pop-up" illegally overnight, and the effect all of this, in conjunction, has on the community. *See, e.g.*, Doc. 8-2 ¶ 15 at 6:00:46– 6:01:31. The City also documented a high percentage of violations at smoke shops. Given this, it is conceivably rational for the City to limit the number of conditional use permits for smoke shops to aid the City's monitoring and enforcement efforts. Additionally, there is no indication in

1    the record that other unlicensed tobacco retailers frequently "pop up" illegally overnight

2    throughout the city.  Thus, there is a conceivable rational reason to subject smoke shops to such

3    regulations and not other tobacco retailers.

4         CSSA takes issue with the fact that "good actor" smoke shops with business licenses, and

5    which previously complied with all relevant laws, may not receive one of the seven conditional

6    use permits per council district and may be forced to close after the 18-month amortization

7    period.  However, that feature does not undermine the regulation's rational relation to its goals,

8    nor does it render any disparate treatment of smoke shops and other tobacco retailers irrational.

9    "The wisdom, fairness, or logic of [the legislature's] choice is not for the Court to decide."

10   *Henner v. Doe by Doe*, 509 U.S. 312, 321 (1993) ("[C]ourts are compelled under rational-basis

11   review to accept a legislature's generalizations even when there is an imperfect fit between means

12   and ends.  A classification does not fail rational basis review because it is not made with

13   mathematical nicety or because in practice it results in some inequality." (cleaned up)).

14        For these reasons, CSSA is not likely to succeed on the merits of its facial equal protection

15   claim.

16                          **ii.  Vagueness**

17        The Ordinance prohibits the sale or distribution of "flavored tobacco," and provides that

18   the sale of flavored tobacco will subject a smoke shop to revocation of its conditional use permit.

19   § 15-2761(G)(12)(d).  It further provides that if flavored tobacco products are found at an

20   establishment during an inspection, the products may be seized and destroyed.  *Id.*  Additionally,

21   the Ordinance provides that fines may be imposed under the sections of the Fresno Municipal

22   Code providing for criminal and administrative citations.  *Id.* § 15-2761(H)(2).  CSSA moves for

23   a preliminary injunction enjoining enforcement of the Ordinance's prohibition of the sale of

24   flavored tobacco on grounds that the phrase "flavored tobacco" is unconstitutionally vague on its

25   face.  Doc. 24-1 at 20–24.  CSSA argues the vagueness is especially problematic since criminal

26   penalties may be imposed for violation of the provision.  *Id.*

27        "The void-for-vagueness doctrine . . . guarantees that ordinary people have 'fair notice' of

28   the conduct a statute proscribes" and "guards against arbitrary or discriminatory law enforcement

                                        21

1  by insisting that a statute provide standards to govern the actions of [enforcers].”  *Sessions v.*

2  *Dimaya*, 584 U.S. 148, 156 (2018) (citations omitted).  CSSA acknowledges that to prevail on its

3  facial claim that it must show that the phrase “flavored tobacco” is “impermissibly vague in all its

4  applications.”  Doc. 24-1 at 21 (citing *Humanitarian Law Project v. U.S. Treasury Dep’t*, 578

5  F.3d 1133, 1146 (9th Cir. 2009)).  However, it argues that the Ordinance’s potential imposition of

6  criminal sanctions for violations of the provision heightens the level of scrutiny the Court should

7  apply, because where an ordinance “imposes criminal sanctions, a more demanding standard of

8  scrutiny applies” such that “the requirement for clarity is enhanced.”  *Id.* (citing *Valle del Sol Inc.*

9  *v. Whiting*, 732 F.3d 1006, 1019 (9th Cir. 2013)).  In short, CSSA argues that a person of ordinary

10  intelligence would not know which products the Ordinance prohibits its members from selling.

11  *Id.* at 22.

12      The Ordinance does not define “flavored tobacco.”  *See generally* Fresno, Cal., Code

13  §§ 15-2761, 15-6802.  However, both parties point to the definition of flavored tobacco in the

14  California Health & Safety Code, which prohibits tobacco retailers from selling flavored tobacco

15  products.[14]  Cal. Health & Safety Code § 104559.5(b)(1).  That statute defines a “flavored

16  tobacco product” as follows:

17      Flavored tobacco product means any tobacco product that contains
       a constituent that imparts a characterizing flavor.  “Flavored
18      tobacco product” includes any tobacco product, other than
       looseleaf tobacco, a premium cigar, or a shisha tobacco product,
19      that is not listed on the Unflavored Tobacco List established and
       maintained by the Attorney General pursuant to Section 104559.1.

20

21  *Id.* § 104559.5(a)(6).[15]

22  _____

23  [14] CSSA’s members are “tobacco retailers” under this provision and are thus prohibited from
    selling flavored tobacco under this statute. Cal. Health & Safety Code § 104559.5(a)(19).  CSSA
24  acknowledges its members are tobacco retailers under state law. *See, e.g.*, Doc. 8 at 22.

25  [15] At the hearing, the parties pointed to this statutory definition of “flavored tobacco” as
    informative in this case.  Neither party has identified any basis to interpret “flavored tobacco” as
26  used in the Ordinance differently than that term is defined under California law, and the
    Ordinance was enacted against the backdrop of this definition in the state statute prohibiting the
27  sale of flavored tobacco products.  The statutory definition is also consistent with the ordinary
    meanings of the terms “flavored” and “tobacco.”  *See* Flavored, Merriam-Webster,
28  https://www.merriam-webster.com/dictionary/flavored (last visited September 11, 2025) (“having

22

1    The statute defines "[c]haracterizing flavor" as:

2        [A] taste or odor, distinguishable by an ordinary consumer either
3        prior to or during the consumption of a tobacco product, other than
     the taste or odor of tobacco, including, but not limited to, tastes or
     odors relating to any fruit, chocolate, vanilla, honey, candy, cocoa,
4        dessert, alcoholic beverage, menthol, mint, wintergreen, herb, or
     spice, or a cooling sensation distinguishable by an ordinary
5        consumer during the consumption of a tobacco product."

6    *Id.* § 104559.5(a)(1), (6).

7        Section 104559.1 requires the Attorney General to "establish and maintain on the

8    Attorney General's internet website a list of tobacco product brand styles that lack a

9    characterizing flavor," which shall be known as the "Unflavored Tobacco List (UTL)," no later

10   than December 31, 2025.  Cal. Health & Safety Code § 104559.1(a)(1), (m).  CSSA argues that

11   the California Legislature's decision to have the Attorney General publish an unflavored tobacco

12   reflects the California Legislature's determination that the term "flavored tobacco products" is

13   impermissibly vague.  CSSA argues that enforcement of the Ordinance's provision should be

14   enjoined at least until the Attorney General publishes that list due by the end of 2025.

15       The Ordinance's use of the term "flavored tobacco" is not impermissibly vague when read

16   in conjunction with the statute's definition of a "flavored tobacco product" as "any tobacco

17   product that contains a constituent that imparts a characterizing flavor," and its definition of

18   "characterizing flavor" as "a taste or odor, distinguishable by an ordinary consumer either prior to

19   or during the consumption of a tobacco product, other than the taste or odor of tobacco" (and

20   listing specific examples).  Given the statutory definitions, the Ordinance's use of the term

21   "flavored tobacco" provides sufficient clarity as to which type of products are prohibited.

22   Moreover, CSSA's members are bound by the state statute, which they do not challenge in this

23   action, barring them from selling such "flavored tobacco products."

24       When faced with a similar argument regarding the potential vagueness of a local

25   ordinance's prohibition on the sale of flavored tobacco, another district court found that the term

26   ─────────────────

27   an added flavor or a specified flavor"); Tobacco, Merriam-Webster, https://www.merriam-webster.com/dictionary/tobacco (last visited September 11, 2025) ("manufactured products of
tobacco (such as cigars or cigarettes)").

28

23

1    "characterizing flavor" was not unconstitutionally vague.[16]  *See CA Smoke & Vape Ass'n, Inc. v.*

2    *County of Los Angeles*, CV 20-4065 DSF (KSx), 2020 WL 4390384 (C.D. Cal. June 9, 2020).

3    There the plaintiffs contended that the ordinance was unconstitutionally vague because the

4    definition of "characterizing flavor" relied on "the existence of a taste or aroma."  *Id.* (internal

5    quotations omitted).  They argued that retailers could not be "expected to detect hints of flavoring

6    based on smell or taste alone" and could not "properly adhere to the [o]rdinance when some

7    tobacco products purchase[d] do not identify whether they contain a flavor or ingredient banned

8    by the [o]rdinance."  *Id.* (internal quotations omitted).  The court agreed with the defendant that

9    "an ordinary layperson" could "determine whether something has a taste or aroma."  *Id.*  The

10   court further held that "tobacco retailers can use basic common sense to determine if the product

11   contains any prohibited flavors or ingredients before selling the product to the general public."

12   *Id.* (internal quotations omitted).  Thus, the court held that "[i]n the vast majority of situations, it

13   will be clear to tobacco retailers when their products impart a characterizing flavor."  *Id.*

14           CSSA similarly argues here that, based on the definition of "characterizing flavor" in the

15   California Health & Safety Code, enforcement officers and smoke shop operators will have to

16   "resort to a subjective taste test to determine" if a given product is flavored.  Doc. 24-1 at 22.

17   Also, similarly to the plaintiffs in *CA Smoke & Vape Association*, CSSA argues that its members

18   cannot rely on the labeling of tobacco products to determine if a product is flavored.  *Id.* at 23.

19   CSSA argues that this is the case because the Ordinance does not provide "guidance as to the

20   markings one would use to determine whether a given product contains" flavoring and because

21   the labeling or markings on tobacco products can be unclear regarding whether a tobacco product

22

23   [16] Although the local ordinance at issue in *CA Smoke & Vape Association*, was enacted before
     California enacted the statute defining "flavored tobacco" and "characterizing flavor," the
24   definitions are similar.  In that case, the ordinance at issue similarly defined "flavored tobacco
     product" as "any tobacco product . . . which imparts a characterizing flavor" and defined
25   "characterizing flavor" as "a taste or aroma, other than the taste or aroma of tobacco, imparted
     either prior to or during consumption of a tobacco product or any byproduct produced by the
26   tobacco product, including, but not limited to, tastes or aromas relating to menthol, mint,
     wintergreen, fruit, chocolate, vanilla, honey, candy, cocoa, dessert, alcoholic beverage, herb, or
27   spice."  *CA Smoke & Vape Ass'n*, 2020 WL 4390384, at *1.

28

1  contains flavoring.[17]  *Id.*

2    The Court finds the reasoning in *CA Smoke & Vape Association* persuasive.  A reasonable

3  person could determine if a product is flavored either by observing the packaging or ingredients,

4  where the packaging indicates that the product is flavored, or, where the labeling is unclear, by

5  assessing with his or her senses if the product has a taste or aroma apart from tobacco.  It will

6  likely be clear to tobacco retailers when a tobacco product imparts a characterizing flavor, at least

7  in the vast majority of situations.

8    And though "[a] vague provision may be unconstitutional even if 'there is some conduct

9  that clearly falls within the provision's grasp,'" *Johnson v. United States*, 135 S. Ct. 2551, 2561

10  (2015), "'the mere fact that close cases can be envisioned' does not render an otherwise

11  permissible statute unconstitutionally vague," *Edge v. City of Everett*, 929 F.3d 657, 666 (9th Cir.

12  2019), *cert. denied sub nom. Edge v. City of Everett, Washington*, 140 S. Ct. 1297 (2020)

13  (quoting *United States v. Williams*, 553 U.S. 285, 305 (2008)); *see also Levas & Levas v. Vill. of*

14  *Antioch, Ill.*, 684 F.2d 446, 451 (7th Cir. 1982) ("a finding of unconstitutional vagueness cannot

15  be based on uncertainty at the margins, or on a parade of bizarre hypothetical cases: problems of

16  that order can be resolved in challenges to the ordinance as applied").  Here, CSSA has not

17  provided any seemingly plausible hypotheticals nor any specific examples of products which its

18  members are unsure whether they can continue to sell under the Ordinance.

19    CSSA has failed to show it is likely to prevail on its claim that the Ordinance's prohibition

20  on the sale of flavored tobacco is facially unconstitutionally vague.

21     **2.  Irreparable Harm**

22    Nor has CSSA shown a likelihood of irreparable harm in the absence of a preliminary

23  injunction.  "Irreparable harm" is a term of art that means a party has or will suffer a wrong that

24  cannot be adequately compensated by remedies available at law, such as monetary damages. *eBay*

25  *Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Plaintiffs must demonstrate more than a

26

27  ───────────

[17] For example, CSSA cites to Councilmember Nick Richardson's comment that some smoke
shop owners may have "a cigarillo that is 'black' flavor and one that is 'white' flavor," and his
28  subsequent question, "which one of those is flavored?").  *Id.*

25

1    mere "possibility" of harm to obtain the extraordinary remedy of a preliminary injunction.

2    *Winter*, 555 U.S. at 22.  And the need to show "substantial and immediate irreparable injury" is

3    especially strong when plaintiffs seek to enjoin the activity of a state or local government.

4    *Hodgers–Durgin v. de la Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999) ("The Supreme Court has

5    repeatedly cautioned that, absent a threat of immediate and irreparable harm, the federal courts

6    should not enjoin a state to conduct its business in a particular way.").

7         CSSA asserts its members will be irreparably harmed without preliminary injunctive relief

8    because its members will be subject to the Ordinance, which it contends is facially

9    unconstitutional for the reasons discussed above.  Doc. 24-1 at 25.  Though "the deprivation of

10   constitutional rights unquestionably constitutes irreparable injury," *Melendres v. Arpaio*, 695 F.3d

11   990, 1002 (9th Cir. 2012) (citations and quotations omitted), this argument cannot help CSSA

12   establish irreparable harm as it has not demonstrated a likelihood of success on its facial equal

13   protection and vagueness claims.

14        CSSA also argues that its members will be irreparably harmed because the enforcement of

15   the Ordinance will result in further inspections of its member smoke shops, resulting in injury to

16   the smoke shops' goodwill and reputations and causing them to lose customers and employees.

17   This argument likewise fails.  As CSSA has not shown that the Ordinance is facially invalid, it

18   cannot show that all inspections pursuant to the Ordinance will be carried out unlawfully.  And

19   CSSA has failed to establish a likelihood of actionable harm to its members from inspections

20   conducted lawfully to ensure compliance with the Ordinance.  To the extent CSSA argues that

21   such inspections would be conducted in a way violative of its members rights that argument is

22   speculative, and speculation cannot form the basis for a finding of likelihood of irreparable harm.

23   *See, e.g.*, *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury

24   cannot be the basis for a finding of irreparable harm.").  It also appears that any such argument

25   would be more properly brought as an as-applied, rather than facial, challenge.

26        CSSA also argues that the City's inspections prior to the enactment of Ordinance caused

27   injury to its members' goodwill and reputations, it fails to show that those inspections were

28   unlawful or improperly caused any injury not attributable to existing conditions at the smoke

1  shops.  Moreover, those inspections preceded the Ordinance's enactment, and therefore, the

2  Ordinance is not the cause of any alleged irreparable harm due to such inspections.

3  For these reasons, CSSA has not shown a likelihood that its members will suffer

4  irreparable harm absent preliminary injunctive relief.

### 3.  Balance of the Equities and Public Interest

6  Finally, CSSA's argument that the balance of the equities and the public interest favor

7  granting a preliminary injunction rests almost entirely on its arguments that it has shown a

8  likelihood of success on the merits and irreparable harm to its members.  CSSA also argues that

9  the City will not be harmed by enjoining enforcement of the Ordinance because "enforcement and

10  compliance activities surrounding smoke shops . . . will remain at their status quo," whereas,

11  without injunctive relief, its members will be harmed by the "loss of customer goodwill and

12  inability to retain employees."  *Id.* at 26–27.

13  However, as noted, CSSA has failed to establish that it is likely to succeed on the merits

14  of its equal protection and vagueness constitutional claims, and it has not shown a  likelihood of

15  irreparable harm without injunctive relief.  Additionally, the public interest is served by the

16  enforcement of the Ordinance.  That is, the public has a strong interest in ensuring that laws

17  passed by its legislative body are implemented.  *See Golden Gate Rest. Ass'n v. City & Cnty. of*

18  *San Francisco*, 512 F.3d 1112, 1127 (9th Cir. 2008) (noting the court's consideration of the

19  public interest is constrained where, like here, city officials have already considered the public's

20  interest and manifested their conclusion in an enacted ordinance; in such case, a court should

21  "conclude that the public interest is . . . served by [the adopted] ordinance" unless it is

22  unconstitutional or preempted by federal law).

23  Thus, the balance of the equities and the public interest also do not favor granting

24  injunctive relief.

25  ///

26  ///

27  ///

28  ///

**III.    CONCLUSION AND ORDER**

  For the foregoing reasons, CSSA's motion for a preliminary injunction, Doc. 24, is denied.

IT IS SO ORDERED.

 Dated: <u> September 11, 2025 </u>

            <u>           </u>
            UNITED STATES DISTRICT JUDGE